IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:06 MJ 79
)
vs. )
)
SEAN C. SOWARDS, )
)
Defendant. )
)

TRANSCRIPT OF AUDIO RECORDING OF
PROBABLE CAUSE HEARING
BEFORE THE HONORABLE CARL HORN, III
UNITED STATES MAGISTRATE JUDGE
APRIL 18, 2006

APPEARANCES:

On Behalf of the Government:

    Thomas A. O'Malley, Assistant U.S. Attorney
    United States Attorney's Office
    Suite 1700, Carillon Building
    227 West Trade Street
    Charlotte, North Carolina  28202

On Behalf of the Defendant:

    Mark P. Foster, Jr., Attorney at Law
    Nixon, Park, Gronquist & Foster, PLLC
    101 N. McDowell, Suite 126
    Charlotte, North Carolina  28204

KAREN H. MILLER, RMR, CRR
U.S. District Court Reporter
Asheville, North Carolina

88032b81-ddf2-438c-a152-02f5d80dbf3e

1    P R O C E E D I N G S

2         (Open court, defendant present.)

3         THE COURT: All right. Mr. Sowards has been charged

4    in a complaint with a drug offense, possession of cocaine

5    hydrochloride in sufficient quantity to carry a 10-year minimum

6    term of imprisonment but, interestingly, has zero criminal

7    history.

8         The primary reason for Ms. Bank's recommendation of

9    detention appears to be his mental health condition.  It states

10   here that he's been depressed or diagnosed with depression and

11   having panic attacks and at some point in college was

12   sufficiently confused that he couldn't remember his name.

13        Anything further from the government as to detention?

14        MR. O'MALLEY: Yes, Your Honor.  Are we here for a

15   prelim as well?

16        THE COURT: Are we?

17        MR. FOSTER: Yes, Your Honor.

18        THE COURT: For a probable cause hearing?

19        MR. O'MALLEY: I have an officer to testify to the

20   facts for both purposes.  First of all, the presumption --

21   obviously, as the Court recognizes, it's a Title 21 offense,

22   and as the Court noted, it's 10 years up to life imprisonment.

23   It's approximately 10 kilograms of cocaine.

24        Additionally point out to the Court that at the time

25   that he was stopped and presented a license, he presented a

1    license to law enforcement at the address of 3490 Leach Drive,

2    Columbus, Ohio.  He also advised in the booking process that

3    that was his address.  I would note, however, that he's told

4    the pretrial services officer a different story.  He's told

5    them that he resides at 160 Worchester Road, Apartment No. 160,

6    in a different city and different state in South Charleston,

7    West Virginia.  He claims to have lived there for seven to

8    eight months and that he lives with somebody else.

9          He has absolutely no ties to this district.  He has

10   no employment either in this district or anyplace else.  His

11   place of living is questionable in light of two different

12   addresses he's given law enforcement and the pretrial services

13   officer.

14         He also claimed in the course of his stop that he was

15   taking a bus from Ohio, where he claimed to have lived, as

16   reflected on the driver's license, for the purpose of bringing

17   back a person's vehicle.  And we'll get into the facts when the

18   officer testifies, but he couldn't give a full name or contact

19   information for the owner of the vehicle.  In fact, after he's

20   arrested and subsequent to a search incident to arrest, they

21   found in his baggage a ticket which was purchased for a one-way

22   travel from Charleston to Atlanta for $659.30.  And he claims

23   not to have any employment or any income.

24         So those are the additional grounds with respect to

25   no contacts, no employment, nothing to tie into, on top of the

1  presumption, and when the Court is ready, I'm prepared to call
2  the witness to testify.
3            THE COURT:  Go ahead and call your witness.
4            MR. O'MALLEY:  Chad Elliott.
5                      CHAD ELLIOTT,
6  being first duly sworn, was examined and testified as follows:
7                    DIRECT EXAMINATION
8  BY MR. O'MALLEY:
9  Q.  Sir, will you please state your full name and spell your
10  last name.
11  A.  James Chad Elliott.  Elliott is spelled E-l-l-i-o-t-t.
12  Q.  Your occupation?
13  A.  I'm a deputy sheriff with the Iredell County Sheriff's
14  Office.
15  Q.  And how long have you been employed in law enforcement?
16  A.  Approximately 10 years.
17  Q.  And with respect to your current employment with the
18  Iredell County Sheriff's Office, how long have you been in that
19  position?
20  A.  I've been in that position for approximately four and a
21  half.
22  Q.  And during the time that you've been with the Iredell
23  County Sheriff's Office, have you had occasion to patrol the
24  interstate highways going through Iredell County in North
25  Carolina?

1   A.   Yes, sir.

2   Q.   And directing your attention to April 11th, 2006,

3   approximately where in relation to Statesville were you

4   positioned on Interstate 77?

5   A.   Near mile marker 59, just north of it.

6   Q.   All right.  And why were you stationed in that position?

7   A.   I was conducting a speed enforcement.

8   Q.   And did there come a time when you stopped the vehicle

9   relative to this case?

10  A.   Yes, sir, I did.

11  Q.   All right.  Tell us what happened.

12  A.   I was sitting in the median at exit -- just north of

13  Exit 59.  I observed a Jaguar traveling north.  I obtained a

14  tracking history on the vehicle.  The vehicle passed my

15  location.  I estimated its speed.  I took out out of the

16  median, proceeded north to catch up to the vehicle, and I

17  conducted a stop with the vehicle for speeding at mile marker

18  62.

19  Q.   What is the posted speed limit there?

20  A.   It's posted at 70 miles an hour.

21  Q.   What did you estimate the speed?

22  A.   75.

23  Q.   What did you proceed to do after noting the speeding

24  infraction?

25  A.   After noting the speeding infraction, I initiated my blue

1  lights in my marked vehicle. I stopped the vehicle near mile

2  marker 62. I exited my vehicle.

3  Q. What did you do at that point?

4  A. I made my approach, made my observation of the exterior of

5  the vehicle and noticed a "Support Education" Georgia license

6  plate on the back of the vehicle.

7  Q. And did you approach the driver?

8  A. I approached on the passenger side at that time. During

9  my approach on the passenger side, I noticed a medium-sized

10  suitcase laying in the back seat. Once I got up to the

11  passenger window, the window was rolled down, and I met with

12  the operator, the defendant sitting here today in court.

13  Q. All right. And who was that identified as?

14  A. Name was Sean Carlos. I believe his last name is Sowards,

15  S-o-w-a-r-d-s.

16  Q. You indicate you see him in court today?

17  A. Yes, sir. He's the gentleman sitting in the orange

18  jumpsuit beside defense counsel.

19      MR. O'MALLEY: May the record reflect the witness

20  identified the Defendant Sowards?

21      THE COURT: Let it so reflect.

22  BY MR. O'MALLEY:

23  Q. So you obtained his -- Did he present you with a driver's

24  license?

25  A. Yes, sir, he did.

1  Q.  What state was the driver's license?

2  A.  Ohio.

3  Q.  And is it the address set forth in this complaint

4  affidavit of 3490 Leach Drive, Columbus, Ohio?

5  A.  That's correct, sir.

6  Q.  Did you ask him for any additional information beyond the

7  driver's license?

8  A.  Yes, sir.  I asked for a registration within the vehicle.

9  Q.  What conversations did you have with him regarding who

10  owned the vehicle and the registration status?

11  A.  I asked him if he knew who owned the vehicle, and before I

12  asked him for the registration, he advised a person by the name

13  of Dianna or Deanna, and I asked him pretty much what the

14  relationship was there.  He said it was his girl's, meaning his

15  girlfriend.  Further into the conversation I asked him if he

16  knew the last name for Deanna, and he couldn't provide a last

17  name but motioned and made a statement about the glove box,

18  that the registration would provide the name for that woman.

19  Q.  So the only name he gave you was Deanna, and he could not

20  provide you with the last name for the purpose claimed to be a

21  girlfriend?

22  A.  That's correct.

23  Q.  All right.  Did he obtain or produce a registration for

24  the vehicle?

25  A.  Yes, sir, he did.

88032b81-ddf2-438c-a152-02f5d80dbf3e

1  Q.  Where was that located?

2  A.  It was in the glove compartment.

3  Q.  And in what name was the vehicle registered?

4  A.  It was named on the registration as a Recha Dailey out of

5  Atlanta.

6  Q.  And so the vehicle registration was out of the city of

7  Atlanta, Georgia?

8  A.  That's correct.

9  Q.  All right.  At that point in time, what did you do?

10  A.  At that point in time I made a physical observation of the

11  vehicle.  I could observe beads of sweat on top of his head and

12  forehead.  Also observed a Boost mobile phone laying on top of

13  the center console in the tray, and also observed several food

14  wrappers strung throughout the vehicle.  I questioned him about

15  the sweat on his forehead and his head, and he made a statement

16  "It's hot as hell in this car, man."

17  Q.  What happened next?

18  A.  I asked him if he wouldn't mind stepping back to my

19  vehicle so I could obtain driver's license information and

20  insurance information, and he was concerned about the K9 that

21  was in my car.

22  Q.  What concern did he have?

23  A.  I took it as he --

24        MR. FOSTER:  Objection as to what he took it as.

25        THE COURT:  Well, we'll let him answer the question

1  and then let Mr. Foster cross-examine, and, of course, there's

2  no jury to hear anything.  So overruled.

3          You may answer the question.

4          THE WITNESS:  I took it as if he was scared of dogs

5  and didn't like being around them and stuff, and I advised him

6  that the dog was placed inside a cage and could not get to him.

7  BY MR. O'MALLEY:

8  Q.  So was the cage between the back seat of your vehicle and

9  the front seat?

10  A.  That's correct.

11  Q.  What happened next?

12  A.  At that time he exited the vehicle.  He exited the vehicle

13  and he come to the back of his vehicle.  I shook his hand;

14  introduced myself, and noticed his hands were caked with

15  perspiration.

16  Q.  What happened next?

17  A.  I asked him if he didn't mind sitting in my car.  He

18  preferred not to, so I told him, I said, you know, that's okay,

19  that's fine.  Then we began discussion about the vehicle, the

20  insurance information and ownership of the vehicle.

21  Q.  What was discussed further?

22  A.  After discussing that a little bit, I asked him where he

23  was coming out of.  He advised me he was coming out of Atlanta,

24  Fulton County.  And I asked him where at in Fulton County, and

25  he made the statement "I don't know, bro," meaning that he did

1    not know the address of where he picked the car up, he just
2    picked it up from his girlfriend.

3    Q.    Did you have conversation about how he got to Atlanta?

4    A.    Yes.   He advised me that he took a bus to Atlanta.

5    Q.    And did he tell you why he was taking a bus to Atlanta to

6    pick up this Jaguar in Atlanta, Georgia?

7    A.    He made the statement something to the effect that he was

8    down there just visiting this girl and he was using the motor

9    vehicle to drive back up because the motor mount went out in

10   his car, his car that he had owned.

11   Q.    Now, what occurred next?

12   A.    At that time I advised him that I was going to check

13   information on his person and on the vehicle information while

14   he remained outside my car.   That's when I placed a phone call

15   to BLOC, which is considered Blue Lightning Operations Center.

16   Q.    And the purpose of checking this is to check the

17   information contained in the driver's license presented to you

18   and the registration?

19   A.    Correct.   And they also would provide a criminal history

20   and also insurance information on the vehicle.

21   Q.    All right.   Is that information that you radioed to this

22   BLOC center?

23   A.    No, sir.   That's -- you have to place a phone call to

24   there.

25   Q.    And that's from your vehicle?

88032b81-ddf2-438c-a152-02f5d80dbf3e

1  A.  That's correct.

2  Q.  And did you relay this information?

3  A.  Yes, sir, I did.

4  Q.  All right.  And what happened during the time period when

5  you're waiting for information back on the driver's license and

6  registration?

7  A.  After I made the phone call, I contacted another partner

8  of mine, told him to respond to the scene.  That person was

9  Sergeant Randy Cass with the Iredell County Sheriff's Office,

10  and I asked him to respond to the scene.

11  Q.  And would you outline the reasons why you had some concern

12  or called for back-up at this point in time while you were

13  waiting for the driver's license and vehicle registration

14  information to come back?

15  A.  Due to the totality of the circumstances, I observed

16  several criminal indicators, and I wanted to conduct a search.

17  Q.  And what were some of those indicators in your training

18  and experience?

19  A.  The indicators that I observed during this stop was a

20  "Support Education" license plate, a medium-sized suitcase

21  laying in plain view, beads of sweat on top of his head and

22  forehead, food wrappers strewn throughout the interior of the

23  vehicle, Boost mobile phone laying in plain view, vehicle

24  registered out of the state of Georgia, and the vehicle coming

25  out of Atlanta, being a source hub for illegal narcotics.  The

1  driver had a license issued out of the State of Ohio. The

2  defendant couldn't provide a last name for his girlfriend,

3  could not provide the name of the owner of the vehicle. He was

4  wiping the sweat off his head, the thick sweat off his head.

5  During the handshake, his hand was extremely wet, and he could

6  not provide an address for where his girlfriend lived or where

7  he picked the vehicle up. He advised me he took a bus to

8  Atlanta, and also, during the stop, to calm his nerves, he was

9  smoking a cigar outside my car.

10  Q.  And during this time period now you're waiting for the

11  information to come back from BLOC?

12  A.  That's correct.

13  Q.  And after calling for back-up, what further did you do?

14  A.  My back-up advised me it was five seconds out. Back-up

15  arrived. Sergeant Cass walked up to the passenger side of the

16  vehicle and advised me that there was definitely something

17  wrong here. I was going to utilize my K9 and do a free air

18  search around the exterior of the vehicle.

19  Q.  And can you just summarize the training you've had with

20  the K9 as it relates to the detection of narcotics?

21  A.  That's correct. I've been a K9 handler for approximately

22  three and a half years. My dog has been certified by the

23  national -- I'm sorry, North Carolina Police Dog Association.

24  The K9 is certified in narcotics. I received approximately six

25  weeks of training with this K9 down in Spring Hope, North

88032b81-ddf2-438c-a152-02f5d80dbf3e

1  Carolina, at the Southern Police Dog, Incorporated.  I've been

2  with this dog for approximately three and a half years.  Myself

3  and this dog have seized millions in illegal narcotics.

4  Q.  Has this dog detected, on prior occasions with you as a

5  handler, narcotics?

6  A.  Yes, that's correct.

7  Q.  And you said at this point, while you're waiting to hear

8  back on the driver's license and the vehicle registration, you

9  conducted a, quote, a free air search.  What is that?

10  A.  That's where the dog, the K9, searches around the exterior

11  of the vehicle.  Never enters the vehicle; he just searches the

12  exterior of the vehicle.

13  K9 Ringo, my dog, he searched around the exterior of the

14  vehicle, indicated on the trunk for the presence and odor of a

15  controlled substance.

16  Q.  And so the dog gave an alert, based on your training, that

17  there was narcotics located somewhere within the trunk?

18  A.  That's correct.

19  Q.  And what happened next?

20  A.  At that time I asked him if he -- if there was anything in

21  the trunk.  He said no.

22  Q.  Referring -- "He," you're referring to the defendant?

23  A.  That's the defendant.

24  Q.  And what happened next?

25  A.  I opened up the trunk.  I started observing the trunk.

1 There was absolutely no luggage in there. But I could smell an
2 overwhelming odor of a detergent in the trunk. I couldn't
3 locate the source of the detergent at that time, so I went to
4 the back seat, opened up the back door to look at the back seat
5 to see if there may be possibly a non-factory installment,
6 maybe a hydraulic or electronic compartment in the back seat,
7 which there wasn't. I went back and I went up underneath the
8 vehicle and looked up underneath and could see that the floor
9 was built down from the factory floor, which was a non-factory
10 installment in that type of vehicle.

11 Q. Let me go back to after the dog had alerted on the
12 controlled substances in the trunk area. How did you gain
13 access to that area?

14 A. The trunk was opened by a key.

15 Q. All right. Where did you get the key from?

16 A. I got it from the defendant.

17 Q. Once you located what appeared to be a non-factory
18 installed lower compartment below the floor of that vehicle,
19 what happened next?

20 A. At that time I pulled the carpet up from the floor,
21 observed a plate, which was the access panel into this
22 compartment. I pulled -- once I observed that, I looked at my
23 partner, Sergeant Cass, and also the defendant, and I informed
24 them that there was a compartment installed in this vehicle,
25 and at that time I walked up to the defendant, I advised the

1    defendant that he was not under arrest but he was being placed

2    under investigative detention until I could figure out further

3    how to gain access to this compartment.

4    Q.   And was there any discussion between you and him regarding

5    the compartment that you had located?

6    A.   Yes, somewhat of a discussion.

7    Q.   And what was said between the two of you?

8    A.   Basically, he did not know what was going on, is what he

9    was telling me, that, you know, he didn't know what was going

10   on, he didn't have any clue.

11   Q.   So what happened next?

12   A.   I put him -- I placed him in Sergeant Cass' vehicle and

13   Sergeant Cass and I then began looking at the compartment

14   further.

15   Q.   And, if at all, how did you gain access to the

16   compartment?

17   A.   I was only able to get the door off the compartment

18   approximately two to three inches.  Once I got the compartment

19   open, because it was held down by a rubber band -- not

20   rubber -- a band, not a rubber band, but a plastic band, and I

21   pried open the door of the compartment, was able to shine a

22   light in there, and observed what I suspected was kilos of

23   cocaine.

24   Q.   And what did you do next?

25   A.   I walked back to the vehicle, explained to the defendant

1 what we had located, and at that point in time Sergeant Hawkins
2 arrived on scene.

3 Q. What happened next?

4 A. We made a decision to transport the vehicle to the Iredell
5 County Sheriff's Office to do a further search since we was
6 having so much of a harder time getting into the vehicle. We
7 transported the defendant and also the vehicle to the Iredell
8 County Sheriff's Office.

9 Q. Now, you're indicating you couldn't get it opened and
10 entered into because it was constrained in some fashion. Was
11 this attempting to access it through the trunk area or from
12 underneath the vehicle?

13 A. The only place to access that compartment would be through
14 the trunk area, underneath that lid, which is the door, and you
15 have to know the sequence of events in order to get into that
16 compartment or attempt to bypass the wires. We were
17 unsuccessful at locating the wires to bypass the compartment.

18 Q. And the view of the package you could see in there, based
19 on your training and experience, appeared to be packages of
20 controlled substance?

21 A. That's correct.

22 Q. And what happened once you returned back to the police
23 department?

24 A. At that point in time we attempted to open up the
25 compartment by locating the wires but was unsuccessful, so

1  sergeant Hawkins, Sergeant Cass and Sergeant Bly opened the

2  compartment by hand. They actually had to break the band by

3  pulling up on the door. Once the door opened, that's when we

4  observed several kilo packages of cocaine.

5  Q.  And was a field test conducted?

6  A.  Yes, sir.

7  Q.  And did it come back positive for the presence of

8  controlled substance?

9  A.  That's correct.

10  Q.  And did you just do a rough weighing of it for purposes of

11  putting the controlled substance into evidence?

12  A.  Yes, sir, we did.

13  Q.  Approximately what was the weight of the cocaine found in

14  the hidden compartment?

15  A.  22 pounds.

16  Q.  Was the defendant eventually read his rights?

17  A.  Yes, sir. I believe Sergeant Ramsey attempted to read him

18  his rights, and I believe Sergeant Ramsey could not get him to

19  answer yes or no. I believe he just put "refused" on his

20  Miranda warning forms, and that was basically it.

21  Q.  And the stop here in Iredell County, that's here within

22  the Western District of North Carolina, correct?

23  A.  That's correct.

24  MR. O'MALLEY: Thank you. I have no further

25  questions, Your Honor.

88032b81-ddf2-438c-a152-02f5d80dbf3e

1          THE COURT:  Mr. Foster?

2          MR. FOSTER:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4     BY MR. FOSTER:

5     Q.   Mr. Elliott, you said you were working speed enforcement

6     on this date?

7     A.   That's correct.

8     Q.   What time of day was this?

9     A.   Approximately 4:10 p.m.

10    Q.   But you're part of this interstate criminal enforcement

11    unit, right?

12    A.   That's correct, sir.

13    Q.   And part of what you do in that is when you stop people

14    for lawful vehicle violations, you also try to get consent or

15    probable cause to search their car for drugs, right?

16    A.   If the indicators are present, absolutely, that's part of

17    my job.

18    Q.   Some of the indicators that were present on this date was

19    the fact, according to your testimony, he had a suitcase in the

20    back seat.  That was one of the factors, right?

21    A.   Yes, sir.

22    Q.   A mobile phone inside the car?

23    A.   That's correct.

24    Q.   So those are unusual facts?

25    A.   Not just one sole indicator makes it unusual.  It's the

88032b81-ddf2-438c-a152-02f5d80dbf3e

1   totality of the circumstances that lead me to believe that the

2   person is involved in criminal activity.

3   Q.   And food wrappers in the car also indicates...

4   (inaudible)?

5   A.   When you put all the indicators together, yes, sir.

6   Q.   And the fact that he's smoking a cigar?

7   A.   Yes, sir.

8   Q.   The name you said that was on the registration, you said,

9   if I heard you right, something like Recha Dailey?

10  A.   That's correct.

11  Q.   How do you spell that?

12  A.   R-e-c-h -- give me one second and I'll look at the -- It's

13  R-e-c-h-a, last name spelled D-a-i-l-e-y.

14  Q.   And I assume you didn't contact that person and interview

15  them?

16  A.   We were never able to locate that person.  As far as we

17  know, that person does not exist.

18  Q.   Now, what was the weather like on this date?

19  A.   It was warm.

20  Q.   So the fact that the person was sweating was not that

21  surprising, was it?

22  A.   I was in a long sleeve.

23  Q.   You said it was warm.

24  A.   Warm, comfortable.

25  Q.   Was it sunny?

1    A.    Yes.

2    Q.    Now, you said you called this BLOC, which stands for Blue

3    Lightning Operations Center.  Is that correct?

4    A.    Yes, sir.

5    Q.    And so this is -- actually, the contact is made by

6    telephone?

7    A.    That's correct.

8    Q.    So you called on a cell phone or something?

9    A.    Yes, sir.

10   Q.    And how long did it take from when you placed that call

11   until when they got back to you?

12   A.    Give me one second.  I'll refer back to my notes.

13         The phone call was placed at 4:19 p.m.

14   Q.    What time did you receive back a response?

15   A.    I received back this response at 4:33 p.m.

16   Q.    So it took 14 minutes for them to respond back?

17   A.    That's correct.

18   Q.    Is that -- is that typical or normal?

19   A.    Yes, sir.

20   Q.    It takes that long?

21   A.    Yes, sir.

22   Q.    So whenever you write someone for -- let's say if you

23   write someone for a ticket normally and there's no suspicious

24   factors, they're still going to have to wait approximately that

25   length of time before you issue a ticket and release them?

1    A.    No, sir.  Only the persons that I'm suspicious of -- the

2    only persons I'm suspicious of on the roadway involving

3    criminal activity.  That's the only time I make this phone call

4    to BLOC.

5    Q.    So, essentially then, the waiting period for the block

6    response was caused by your suspicion of the things you saw in

7    the car before you actually searched and found what you said

8    appeared to be packages of cocaine?

9    A.    Could you say it again?  I couldn't hear you, sir.

10   Q.    The things that caused the calls to BLOC and the delay

11   that comes from that were what you observed prior to the

12   search?

13   A.    Yeah.  Prior, before making that phone call, I observed

14   several indicators consistent with criminal activity, and as a

15   result of observing these indicators, that's the reason why I

16   made the phone call to BLOC to take it further.

17   Q.    So, in other words, had those suspicious circumstances not

18   been present, just based on the speeding violation, you would

19   have just issued a ticket and then --

20   A.    That's correct.

21   Q.    Did you end up issuing him a ticket?

22   A.    I issued him a warning.

23   Q.    Was that a written warning?

24   A.    Yes, sir.

25   Q.    When did you issue him a warning?

1   A.   The warning was issued at the office after we had located

2   the illegal narcotics.  And the reason for that is I was in the

3   process of writing the warning while my partner was -- while I

4   was talking to my partner, Sergeant Cass, I made a decision at

5   that time I wanted to run the dog while waiting for the call

6   back from BLOC so I could go further with this, because at that

7   point in time I didn't know who owned the vehicle, I didn't

8   know if the vehicle was stolen, if it was used to transport

9   illegal narcotics, what it was, but I knew by my training and

10  experience that there was criminal activity afoot.

11  Q.   Now, you saw my client's car and decided it was speeding.

12  Were you in a stationary position?

13  A.   I was in a stationary position.

14  Q.   What did you use to estimate his speed?

15  A.   My visual estimation.

16  Q.   And after you pulled out and followed him, did you obtain

17  a pace?

18  A.   No, sir, I didn't need to.  The violation had already

19  occurred.

20  Q.   Now, you've testified that you opened the trunk with a key

21  that you got from my client?

22  A.   That's correct.

23  Q.   How did you get the key?

24  A.   He gave it to us.

25  Q.   And why did he give it to you?

1   A.   We asked for it.

2   Q.   You say you asked for it.  What exactly did you say?

3   A.   "Let me see your keys."

4   Q.   So he gave you the keys.  In other words, you did not ask

5   for consent to search, correct?

6   A.   I had probable cause.

7   Q.   So you didn't ask for consent to search?

8   A.   I didn't need to.  It was during the course of the stop.

9   Q.   So when you told my client, once you saw that plate, that

10  he was on investigative detention, he was not free to leave,

11  correct?

12  A.   No, sir, he wasn't.

13  Q.   Now, when you looked through this compartment the two to

14  three inches with the flashlight, you concluded that these were

15  kilos of cocaine.  What exactly did you see that led to that

16  conclusion?

17  A.   Brown type packages approximately this wide.

18  Q.   Couple inches?

19  A.   Couple inches.  I've located kilos of cocaine, pounds of

20  cocaine, tape, that looked exactly the same way.  I even

21  advised the defendant that, during the time that I located

22  packages in the trunk, that I believed that was consistent with

23  cocaine.

24  Q.   But he didn't respond to that?

25  A.   No, sir, he didn't.

88032b81-ddf2-438c-a152-02f5d80dbf3e

1  Q.  Now, I believe you testified that after you saw these

2  suspicious things, before you did the search and you radioed

3  Sergeant -- is it Sergeant Cass?

4  A.  That's correct.

5  Q.  And I think you said he was five seconds away.

6  A.  That's exactly what he said.  He said, "I'm about five

7  seconds out."

8  Q.  Is that about the time he arrived then after you talked to

9  him?

10 A.  To be honest with you, I don't know exactly when he got

11 there, but he's usually a man of his word.

12 Q.  And so, then, you wanted to have back-up present before

13 you did the search; is that correct?

14 A.  That's correct.

15 Q.  Were you still waiting for a response from the BLOC?

16 A.  That's correct.

17 Q.  Now, you were asked about the positive field test.  Was

18 that positive field test positive for cocaine?

19 A.  Yes, sir.

20 Q.  Who actually did the field test?

21 A.  Lieutenant David Ramsey.

22 Q.  So you said Lieutenant Ramsey read the defendant his

23 Miranda rights but was not able to get responses as to whether

24 he was going to waive his rights; is that correct?

25 A.  I was not present during the reading of those Miranda

1  warnings but that's what Lieutenant Ramsey advised me.

2  Q.  So you're not aware of any incriminating statements made

3  by my client?

4  A.  While he was placed under arrest?  No, sir, I'm not.

5  Q.  Or at any time.

6  A.  At any time.

7           MR. FOSTER:  I have no further questions.

8           THE COURT:  Anything further?

9                    REDIRECT EXAMINATION

10  BY MR. O'MALLEY:

11  Q.  At any point in time as a (inaudible) of the registered

12  owner, did the defendant ever offer to use the Boost phone that

13  was sitting there to call the girlfriend who allegedly gave him

14  this car to use?

15  A.  No, sir.

16  Q.  During the time of this stop, in checking out the driver's

17  license, registration, the driver's license, waiting for that

18  information to come back and the dog search, did the defendant

19  make any comments regarding the stop, the nature of the stop

20  and what you had authority to do?

21  A.  He made the statements to Sergeant Cass.  He said he

22  couldn't understand why a routine traffic stop could result --

23  I don't know what exactly he said word for word.  This is

24  hearsay from Sergeant Cass.  But he said that he made a

25  statement about he couldn't understand why a routine traffic

1  stop was made and it led into a K9 search, and then Sergeant

2  Cass advised him you need to talk to Sergeant Elliott about

3  this.

4  Q.  And at any point in time did he ever offer to call the

5  registered owner of the vehicle?

6  A.  No, sir.

7  Q.  And at some point in time, did you find -- you found an

8  airline ticket somewhere?

9  A.  Yes, sir, I did.

10  Q.  And what was that?

11  A.  The airline ticket was discovered by Sergeant Cass.  It

12  was a Delta Airlines ticket, a one-way ticket from Charleston,

13  West Virginia, to Atlanta, Georgia.

14  Q.  And what did the ticket information reflect as far as the

15  amount of the ticket and the type of payment?

16  A.  It was by cash, 650 -- $659.30, and form in payment of

17  cash.

18  Q.  And what was the date of that flight?

19  A.  It says April 10th, 2006.

20  Q.  So the day before this car stop on April 11th, 2006?

21  A.  That's correct.

22        MR. O'MALLEY:  Thank you. I have no further

23  questions.

24        MR. FOSTER:  Just briefly.

25  ...

88032b81-ddf2-438c-a152-02f5d80dbf3e

1    RECROSS-EXAMINATION

2    BY MR. FOSTER:

3    Q.   Maybe I'm not hearing you right.  When you're talking

4    about this phone, are you saying Boost phone?

5    A.   Boost mobile phone.  It's a prepaid-minutes phone.

6              MR. FOSTER:  I have nothing further.

7              THE COURT:  All right.  You may step down.  Thank

8    you.

9              Any further evidence from the government?

10             MR. O'MALLEY:  No, Your Honor.

11             THE COURT:  Mr. Foster, do you want to be heard as to

12   probable cause?

13             MR. FOSTER:  Your Honor, I think some of what we

14   heard today would be for suppression motion but it's probably

15   not pertinent for the purposes of probable cause.

16             THE COURT:  That was my precise thought.

17             I would have had some questions for Sergeant Elliott

18   had this been a suppression hearing, but it's not.  And so

19   we'll find that probable cause does exist to support this

20   complaint.

21             Now, as to detention, you want to be heard on that,

22   Mr. Foster?

23             MR. FOSTER:  Yes, Your Honor.  As the government has

24   stated, and the Pretrial Services Report indicates, my client

25   apparently has no criminal record, and I think that's an

1 important factor. That's something unusual to see in this type
2 of case.

3 I spoke with his mother this morning up in Columbus,
4 Ohio. That's his permanent residence. He is wanting to come
5 back there. So he got a place to live. And my client, when I
6 met with him last week, assured me that he would make his court
7 appearances and come down here... (inaudible) ... didn't think
8 that would be a problem.

9 So we would ask the Court to consider releasing him
10 under those circumstances and assert that the fact that he does
11 have no criminal record and has a place to live with his
12 parents would overcome the presumption that would apply in this
13 type of case.

14 THE COURT: All right. I think -- let's keep an open
15 mind about that. But I'd like to have his mother here, and I
16 think, for the time being, the lack of any ties to our
17 community -- you know, if this evidence is suppressed, that's a
18 whole other ball game. I have serious questions that anybody
19 can look at a car and tell it's going 75 instead of 70 miles an
20 hour just by glancing at it. So, I mean, this whole stop is
21 somewhat questionable. Some of these indicators don't strike
22 me as being remotely -- having wrappers in your car. I've
23 heard that argument before. I don't buy it.

24 I do think the information -- misinformation about
25 how he got to Atlanta, bus versus airline ticket, clearly is

1    dubious, not being able to name his girlfriend's last name, who
2    he supposedly got the car from, and a different registration
3    name being in the glove compartment, obviously, in my mind
4    would be suspicious.

5           When the dog alerts, there's nothing wrong, as long
6    as the detention -- well, if the stop was no good, then the
7    whole thing is no good.  If the dog was led to the car within a
8    reasonable amount of time based on any -- and I'm not sure what
9    order -- that's why I said I would have asked some questions if
10   this had been a suppression hearing -- when these legitimately,
11   in my view, suspicious things occurred, would constitute
12   reasonable suspicion, and if the dog alerted during that period
13   of time, then everything would have been proper.  But, again,
14   that's for another day.  I think there's enough.

15          And then the issues about not knowing his own name in
16   college, and I'm not sure what's going on in the mental health
17   front here, but I will keep an open mind and hear from maybe
18   family later and look at it again.

19          MR. FOSTER:  Thank you, Your Honor.

20          THE COURT:  Sure.

21          (End of proceedings.)

22                 *** END OF TRANSCRIPT ***

23

24

25

88032b81-ddf2-438c-a152-02f5d80dbf3e

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Karen H. Miller, Official Court Reporter, certify

7  that the foregoing transcript is a true and correct transcript

8  of the tape-recorded proceedings transcribed under my

9  direction.

10         Dated this 24th day of May, 2006.

11
                                   S/ Karen H. Miller
12                                 ---------------------------
                                   Karen H. Miller, RMR, CRR
13                                 Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

88032b81-ddf2-438c-a152-02f5d80dbf3e